CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

2/4/2020

JULIA C. DUDLEY, CLERK
BY: s/ MARTHA L. HUPP
DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## THE WESTERN DISTRICT OF VIRGINIA
## DANVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Court No.  4:20-cv-00010 |
| | ) | |
| Cashier's check #1002137744 from BB&T | ) | |
| in the amount of $7,025.29; | ) | |
| Cashier's check #1002137734 from BB&T | ) | |
| in the amount of $2,696.58; | ) | |
| Cashier's check #1002137719 from BB&T | ) | |
| in the amount of $30,077.40; | ) | |
| Cashier's check #1002137709 from BB&T | ) | |
| in the amount of $6,040.53. | ) | |

### VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Now comes the plaintiff, United States of America, by and through its attorney, Krista

Consiglio Frith, Assistant United States Attorney, and brings this Complaint and alleges as follows

in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

### NATURE OF THE ACTION

1. This is a civil action *in rem* brought to forfeit and condemn certain personal property

assets to the use and benefit of the United States, pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C.

§ 981(a)(1)(A), for violations of 21 U.S.C. § 856(a)(1).

### THE DEFENDANTS *IN REM*

2. The defendant property consists of the following property, which were seized from the

BB&T located in Collinsville, Virginia and are currently in the custody of the United States

Marshals Service in the Federal Reserve Bank, Seized Asset Deposit Fund Account:

> (a) Cashier's check #1002137744 from BB&T in the amount of $7,025.29, seized
> on July 17, 2019, from Savings Acct. #0005530571493, held in the name
> of Vincent K. Jones;

1

(b) Cashier's check #1002137734 from BB&T in the amount of $2,696.58 seized from BB&T on July 17, 2019, from Bright Checking Acct. #1470000014729, held in the name of Vincent K. Jones;

(c) Cashier's check #1002137719 from BB&T in the amount of $30,077.40 seized from BB&T on July 17, 2019, from Money Rate Savings Acct. #0000151907903, held in the name of Vincent K. Jones;

(d) Cashier's check #1002137709 from BB&T in the amount of $6,040.53 seized from BB&T on July 17, 2019, Business Value 500 Checking Acct. #0005132475751, held in the name of Community Family Care.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4. This Court has *in rem* jurisdiction over the defendant property under 28 U.S.C. § 1355(b).

5. Venue is proper in this district pursuant to 28 U.S.C. §1355(b)(1) because the acts giving rise to this forfeiture occurred in this district and pursuant to 28 U.S.C. § 1395 because the property is located in this district.

6. Upon the filing of this Complaint, Plaintiff requests the Clerk of Court issue a Warrant of Arrest *in rem* pursuant to Supplemental Rule G(3)(b)(i), which Plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## BASIS FOR FORFEITURE

7. The defendant property is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A), constitutes or is derived from proceeds traceable to a violation thereof.

## FACTS

8. The facts supporting this Complaint are stated in the attached Declaration of Task Force Officer Anita Sowers, Drug Enforcement Administration, and are incorporated by reference herein.

WHEREFORE, the United States of America respectfully requests the Clerk of Court issue a Warrant of Arrest *in rem* pursuant to Supplemental Rule G(3)(b); due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; judgment be entered declaring the defendant property to be condemned and forfeited to the United States of America for disposition according to law; and the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

THOMAS T. CULLEN
United States Attorney

s/Krista Consiglio Frith
Assistant United States Attorney
Virginia States Bar No. 89088
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2250
FAX (540) 857-2614
krista.consiglio@usdoj.gov

3

## VERIFICATION

I am a Task Force Office Anita Sowers of the Drug Enforcement Administration, and one of the agents assigned the responsibility for the above-captioned matter. I have read the contents of the foregoing Complaint for Forfeiture, and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 3rd day of February, 2020.

Anita Sowers
Task Force Officer, Drug Enforcement Administration

4

**AFFIDAVIT**

1.  I am employed by Martinsville Police Department (MPD) as a Master Patrol Officer assigned to the Special Investigations Unit.  I have been employed with the City of Martinsville since 1997 first as a Deputy working as a Corrections Deputy until 1999 when I became a Police Officer for the City of Martinsville. I have attended basic training courses for both core series provided by the Commonwealth of Virginia, Department of Criminal Justice Services.  I have been certified as a law enforcement officer for 21 years and assigned to the Special Investigation Unit for three (3) years. In that capacity, my duties include the investigation of narcotic cases, including assisting with general investigations. In January 2017, I was deputized as a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA), currently assigned to the Roanoke Resident Office (RRO) Tactical Diversion Squad (TDS) in the Washington Field Division and have worked in that capacity for three (3) years. By virtue of the position of TFO, your Affiant is a federal law enforcement officer empowered to conduct investigations concerning the unlawful possession, possession with intent to distribute, and unlawful distribution of controlled substances, and associated conspiracies, and to make arrests for violations of Title 21, United States Code, Sections 841 and 846. Your Affiant has received special training in drug identification and drug diversion methods from various local, state, and federal law enforcement and regulatory agencies.

2.  This affidavit is based upon my personal knowledge and participation in an ongoing drug investigation, as well as, the personal knowledge and participation of other experienced law enforcement officers participating in this investigation.

3.  There is probable cause, based on information contained in this affidavit, to believe that Vincent K. JONES, MD, Ricky MITCHELL, Andre HAIRSTON and others known and yet unknown operated businesses and/or managed bank accounts in furtherance of a conspiracy

1

to distribute Schedule II and Schedule IV controlled substances (namely oxycodone and hydrocodone-acetaminophen and possibly others) in violation of Title 21, United States Code, Sections 841(a)(1) and 846 and other code sections as described below. Specifically, JONES and others were using, and continued to use, COMMUNITY FAMILY CARE ("CFC") to distribute Schedule II and Schedule IV controlled substances in violation of Title 21, United States Code, Sections 846, 841 (a)(1), and 856(a)(1). In addition, as set forth herein, there is probable cause to believe that JONES and others were using CFC to commit Health Care Fraud and Wire Fraud in violation of Title 18, United States Code Sections 1347 and 1343, respectively.

4.  From my experience with investigations involving the illegal distribution and uses of pharmaceutical drugs, I know that the above-described controlled substances are highly subject to abuse and are often sold among individuals without prescriptions in the illicit marketplace, not only in the Western District of Virginia, but also throughout the United States.

5.  JONES was registered with the DEA as a Practitioner with the authority to handle, which includes prescribing, ordering, and/or administering, controlled substances in Schedules 2, 2N, 3, 3N, 4, and 5 under DEA Registration Number BJ6136065, issued December 7, 1998 with an expiration date of December 31, 2019. On May 6, 2018, JONES received a waiver under 21 U.S.C. § 823(g)(2)(B) to treat a maximum of 30 patients at one time for maintenance and detoxification treatment of opioid addiction in accordance with the Drug Addiction Treatment Act of 2000 under DEA Registration Number XJ6136065. JONES' registered address is 1856 Virginia Avenue, Martinsville, Virginia.

6. On March 14, 2019, Confidential Source 3 ("CS3") was interviewed by your Affiant and Health and Human Services Special Agent (SA) Robert Slease regarding his/her knowledge of JONES. The interview took place at the MPD located in the vicinity of 55 West Church Street, Martinsville, Virginia. CS3 received prescriptions from JONES and provided the following information:

   a. CS3 stated that he/she had been a patient of JONES since 2014 and was being treated for high blood pressure, leg pain related to knee surgery and a torn anterior cruciate ligament, and back pain from a fall. CS3 stated JONES prescribes him/her high blood pressure and cholesterol medication as well as Xanax and oxycodone every month.

   b. CS3 stated that he/she has met JONES on the street to obtain his/her prescriptions when CS3 did not have money to pay for an office visit or when he/she did not have transportation. CS3 stated that JONES would present prescriptions for oxycodone and Xanax out of the window of JONES' vehicle to CS3. CS3 stated on another occasion he/she went to JONES' residence to obtain prescriptions for oxycodone and Xanax. JONES did not charge CS3 for these prescriptions.

   c. CS3 stated that JONES had provided a prescription for oxycodone-acetaminophen 5/325 for CS3's daughter AK. CS3 stated that AK was not a patient of JONES and had not been examined by JONES.

   d. CS3 admitted to having a sexual relationship with JONES. CS3 stated the sexual relationship started in or around 2014 and that the encounters occurred at JONES' residence. CS3 stated that JONES would send CS3 text messages when JONES wanted to meet.

7. On March 14, 2019, Diversion Investigator (DI) Bobby Horton, Group Supervisor (GS) Christopher Dziedzic, and TFO Lawrence Findley conducted an interview of A.K. at MPD. A.K. agreed to speak with investigators regarding a prescription of oxycodone-acetaminophen 5-325mg, written to AK by JONES on May 15, 2018. According to A.K., he/she had no knowledge of the prescription. A.K. stated that he/she is not a patient of JONES and has never met JONES. A.K. stated that his/her mother was a patient of JONES and has been for a few years. A.K. stated his/her mother is seen monthly by JONES and is prescribed medication.

## Interview of CS3

8.  On June 27, 2019, Assistant United States Attorney (AUSA) Michael Baudinet, AUSA Katherine Payerle, and your Affiant interviewed CS3.

9.  CS3 explained how he/she became a patient of JONES. CS3 stated that Dr. (John) McGee referred CS3 to JONES.

10. CS3 stated friends also referred him/her to JONES. CS3 tried to obtain an appointment but JONES wasn't accepting new patients. CS3 stated that Tony Bradley was close friends with MITCHELL so T. Bradley and MITCHELL set it up for CS3 to become a patient.

11. CS3 stated that his/her major income since losing his/her job was that he/she sold his/her pills prescribed to CS3 by JONES. CS3 stated that there were usually people waiting in the parking lot of JONES' office when CS3 received his/her prescriptions whom CS3 sold his/her prescriptions to.

12. CS3 admitted to having a sexual relationship with JONES. CS3 stated that he/she would meet JONES on the street. JONES would provide a white envelope to CS3 containing CS3's prescriptions for oxycodone, Xanax, blood pressure medication, and cholesterol medication.

13. CS3 stated he/she had only 2-3 drug screens during her appointments at JONES' office and the last one occurred approximately two (2) years ago. CS3 stated that he/she was never required to do a pill count.

14. CS3 stated that JONES would enter the exam room and would be writing the prescriptions out as JONES talked. CS3 stated that JONES never did any physical exam on CS3 and that JONES usually stayed in the room for approximately five (5) minutes.

15. CS3 stated that when she did not have insurance, she paid $85 per office visit and $180-190 for the prescriptions. She told investigators that to help pay for these visits and prescriptions, she would sell her oxycodone pills for $15 each and her Xanax pills for $2 each, in cash.

16. CS3 explained how he/she obtained a prescription for A.K. CS3 stated that JONES had texted CS3 and CS3 explained that A.K. was experiencing a toothache and CS3 was planning to take A.K. to the emergency room. JONES met up with CS3 near CS3's home. During this encounter, JONES requested A.K.'s name and advised CS3 to "start walking." CS3 stated that he/she met JONES on the street near CS3's residence of 10 Moss Street, Martinsville, Virginia and JONES presented a white envelope containing a prescription for Percocet 5-325mg in A. K.'s name.

17. CS3 stated that he/she hasn't had any sexual contact with JONES since January-February 2019, and CS3 last contact with JONES was in April 2019, during an appointment under the direction of the DEA and that no other contact has been made.

### Interview of A.K.

18. On June 27, 2019, AUSA Baudinet, AUSA Payerle, and your Affiant interviewed A. K.

19. AUSA Baudinet presented A. K. with Advisement of Rights. A. K. acknowledged she (A. K.) understood her rights and agreed to answer questions.

20. A. K. was asked if she (A.K.) knew Dr. Vincent JONES, A.K. responded "a little bit." A.K. stated that JONES was her (A.K.) mother's doctor and that her (A.K.) mother was seen by JONES on a monthly basis.

21. A.K. was asked if she (A.K.) had ever met JONES. A.K. stated she (A.K.) saw JONES one time while accompanying her (A.K.) mother to an appointment. A.K. stated that she (A.K.) remained in the waiting area.

5

22. A.K. stated that she (A.K.) has never received a prescription from JONES. According to data obtained from the Virginia Prescription Monitoring Program (VAPMP), A.K. received a prescription for oxycodone-acetaminophen 5-325mg, zero refills. (Rx #769067) on May 15, 2018 from JONES.

## Interview of Andre' HAIRSTON on July 17, 2019

23. On July 17, 2019, at 12:40 PM, DEA RRO TFO Findley and MPD Lieutenant Richard Barrow conducted an interview of HAIRSTON at CFC located at 1856 Virginia Avenue, Martinsville, Virginia. The interview was in regard to his employment at CFC.

24. HAIRSTON advised he had a bachelor's degree from Virginia Commonwealth University in Homeland Security and had taken a few medical classes while in school. HAIRSTON acknowledged that he started working at CFC in 2002, but didn't start at his current position as office manager of CFC until approximately 2012. When the former office manager left in 2012, HAIRTON explained that JONES asked him if he would take the position.

25. As office manager, HAIRSTON admitted being responsible for "everything in the office" from answering the phone, handling insurance and billing questions, and taking care of patient files. HAIRSTON would not say how much he was paid, but did say he was paid by check from CFC. HAIRSTON explained that the office was open Monday through Friday 8AM to 4PM and the clinic was owned by JONES.

26. HAIRSTON advised if someone wanted to become a new patient, they would have to come in and sign a medical release so CFC could get a copy of their patient file. Once the file is received, JONES would make the decision whether to accept the patient or not. HAIRSTON did not know what criteria JONES used to make the decision, but the first exam would

6

include a chest x-ray and lab work. The only limitations HAIRSTON is aware of
for accepting new patients is they have to be over 18 years of age.

27. When asked, HAIRSTON stated he didn't know what prescriptions JONES wrote to his
patients. JONES would refer his patients out to a specialist when he needed to and CFC sees
10 to 15 patients a day. CFC takes all kinds of insurance and for new cash patients CFC
charges $160.00 and for insurance patients CFC charges $170.00. HAIRSTON advised CFC
only gets 2 or 3 cash paying patients a week[1].

28. HAIRSTON stated CFC does a drug screen on his patients on every visit and JONES has
discharged patients for failing drug screens. Another employee, however, told investigators
that during her four years of working at CFC, she had only drafted three letters of discharge.
HAIRSTON added that JONES also discharges patients for being rude, cussing JONES
during a visit, and for not showing up for their appointment.

29. HAIRSTON stated, to his knowledge, there are not any patients brought to the clinic by a
sponsor, doesn't know of any patient or employee getting a discounted rate or receiving any
prescriptions outside of the office. Lastly, HAIRSTON stated he (HAIRSTON) did not
know if any of the employees were patients of JONES or if any were getting prescriptions
from JONES.

---

[1] According to an interview with Rita Smith, an employee of JONES, all urine drug screens are
sent out to the lab and that drug swabs can be done in the office. Smith stated that patient's need
drug screens every three months, but JONES can ask for drug screens every month. Smith stated
if a patient fails a drug screen, they will get another test the next month. Smith stated a lot of
patients get a pass for failing a drug test. Smith said even if a patient fails a drug screen, JONES
will give them prescriptions. Smith stated that drug screens are documented in the patient file.
Smith stated JONES does not discharge patients for failing drug tests.

**Prescription Drug Diversion by Patients Treated by JONES**

30. Through the course of this investigation, your Affiant learned that several patients of JONES

were re-distributing pharmaceuticals prescribed to them by JONES.  Further investigations

by the Henry County Sheriff's Office and MPD resulted in controlled purchases of narcotics

from several patients of JONES.  These individuals were later indicted by Henry County

and/or Martinsville and other suspects were arrested.  TDS Members attempted to interview

those suspects. Although there is no direct evidence that JONES is aware of these arrests,

Martinsville is a small community. The following patients of JONES were arrested for

unlawfully distributing pills obtained via prescriptions that JONES wrote:

   a.  On March 19, 2018, Henry County Sheriff's Office acquired a Grand Jury
       indictment for C.S.M., for one count of Distribution of Oxycodone. On March 21,
       2018, C.S.M. was arrested by Henry County Sheriff's Office for Distribution of
       oxycodone. According to the Virginia Prescription Monitoring Program
       ("VAPMP") database, C.S.M. has received eleven (11) prescriptions for
       oxycodone HCL 10mg tablets totaling 1,290 dosage units, two (2) prescriptions
       for oxycodone HCL 5mg tablets totaling 120 dosage units from January 2017 to
       March 2018 which were prescribed by JONES.

   b.  On November 8, 2018, K.L. was arrested for distribution of hydrocodone second
       offense and distribution of Fentanyl second offense. According to VAPMP, K.L.
       did not receive hydrocodone or fentanyl but KL did receive five (5) prescriptions
       for oxycodone HCL 15mg tablets totaling 390 dosage units, fifteen (15)
       prescriptions for oxycodone HCL 10mg tablets totaling 1,170 dosage units, two
       (2) prescriptions for oxycodone HCL 5mg tablets totaling 120 dosage units from
       June 2017- October 2018 prescribed by JONES.

   c.  S.C. was arrested for three (3) counts of distribution of oxycodone. VAPMP data
       shows S.C. receiving four (4) prescriptions of oxycodone-acetaminophen 10-325
       for a total of 240 dosage units on December 18, 2017, and the charges for the
       offense occurred on December 20th and 21, 2017.  S.C. received thirteen (13)
       prescriptions of oxycodone-acetaminophen 5-325 for a total of 780 dosage units.
       According to VAPMP, the prescription was filled on January 16, 2018 and the
       offense date for the charge occurred on the same date.  All prescriptions were
       prescribed by JONES.

   d.  J.F. was arrested for distribution of Alprazolam and two (2) counts of distribution
       of oxycodone. VAPMP data shows J.F. receiving four (4) prescriptions for
       oxycodone HCL 10mg for a total of 240 dosage units, four (4) prescriptions for

8

oxycodone HCL 15mg for a total of 240 dosage units, three (3) prescriptions for oxycodone HCL 20mg for a total of 360 dosage units, eight (8) prescriptions for oxycodone HCL 30mg for a total of 960 dosage units, eleven (11) prescriptions for Alprazolam 1mg for a total of 720 dosage units, three (3) prescriptions for Alprazolam .25mg for a total of 180 dosage units and five (5) prescriptions for Alprazolam .5mg for a total of 300 dosage units from January 2017 through November 2018; all of which were prescribed by JONES.

e. M.H.S. was arrested for two (2) counts of distribution of hydrocodone. VAPMP data shows M.H.S. receiving eighteen (18) prescriptions for hydrocodone-acetaminophen 10-325mg for a total of 2,160 dosage units and four (4) prescriptions for hydrocodone-acetaminophen 5-325mg for a total of 480 dosage units from January 2017 through October 2018. One prescription was filled on June 18, 2017 and the offense date leading to the charge was on June 19, 2017. Another prescription was filled on July 18, 2017. All prescriptions were prescribed by JONES.

f. G.H. was arrested for distribution of oxycodone, distribution of methadone, and conspiracy to distribute oxycodone. VAPMP data shows G.H. receiving one (1) prescription for oxycodone HCL 30mg for a total of 120 dosage units, thirteen (13) prescriptions for oxycodone HCL ER 80mg for a total of 1,170 dosage units, and nine (9) prescriptions for OxyContin 80mg for a total of 780 dosage units prescribed by JONES. According to VAPMP, a prescription for oxycodone was filled on December 15, 2017 and the offense date for the charge occurred on the same date.

g. O.T. was arrested for distribution of morphine second offense, distribution of hydrocodone second offense, and distribution of oxycodone second offense. VAPMP data shows O.T. receiving twenty-four (24) prescriptions for oxycodone HCL 10mg for a total of 2,010 dosage units from January 2017 through November 2018 prescribed by JONES. According to VAPMP, a prescription for oxycodone was written by JONES and filled on January 19, 2018 the same date as the offense date.

h. M.S. was arrested for two counts of distribution of Hydrocodone. VAPMP data shows M.S. receiving twelve (12) prescriptions for hydrocodone-acetaminophen 5-325 for a total of 720 dosage units, and ten (10) prescriptions for hydrocodone-acetaminophen 10-325 for a total of 900 dosage units from January 2017 through October 2018 prescribed by JONES. According to VAPMP, a prescription for hydrocodone-acetaminophen 5-325mg was filled on October 25, 2017 and the offense date for the charge occurred on October 26, 2017. Another prescription for hydrocodone-acetaminophen 5-325mg was filled on December 24, 2017, prescribed by JONES.

31. After he/she was arrested, JONES patient M.H.S. was interviewed by TFO Angela Simpson, TFO David Clements, and TFO Findley. M.H.S. stated that he/she provided a urine sample

9

for drug screening every three (3) months. M.H.S. stated on two occasions, he/she had

provided a urine sample which did not contain traces of the medication that M.H.S. was

prescribed.[2]  Based on your Affiant's training and experience, the absence of prescribed

medication in a urine sample is significant because it can be an indicator that the patient is

taking the medication too quickly, or is diverting (i.e., selling) some of the pills prescribed.

32. M.H.S. stated that JONES advised M.H.S. that he/she better have the medication in his/her

(M.H.S.) system on the following drug screen.  M.H.S. stated that JONES did not mention

nor was any action taken following the two failed drug screens.

33. G.H. was also interviewed, and similarly stated that JONES administers drug screenings

around every three (3) months. G.H. said he/she is unaware if he/she had ever failed a drug

screen, but said one time in 2017, he/she "didn't have enough in [him/her]."

34. O.T. was interviewed by TFO Clements, TFO Simpson, and TFO Findley. O.T. stated that

he/she had been a patient of JONES for approximately four years and was being treated for

pain from kidney stones. O.T. stated that he/she heard about JONES on the street and that

JONES has a reputation of being a physician who will prescribe "whatever you need".

35. O.T. explained that JONES had a number of patients who are able to walk directly into the

back office area and obtain a prescription. O.T. estimated that these individuals are typically

on the premises for approximately five (5) minutes. O.T. also stated that JONES had posted

signs in the office stating that patients should not come to his (JONES') house. O.T. stated

that he/she had direct knowledge that CS3 has received prescriptions from JONES on days

that the office was not open.

---

[2] M.H.S. and other patients of JONES did claim that their prescription medication is a necessity
to managing their pain.

## Review of Records of JONES' Prescribing Practices

36. In a series of investigations dating back to 2007, JONES was – at least twice – ordered by the Virginia Board of Medicine to undergo continuing education related to the prescribing of opioids. Nonetheless, a 2015 review by the Department of Health Professions ("DHP") of his patient records show inconsistent and inadequate patient visits, and effective May 1, 2019, the Virginia Board of Medicine prohibited JONES from prescribing Schedule II or III controlled substances and supervising any prescriber of Schedule II or III substances.

37. During the course of this investigation, investigators obtained raw prescription data for controlled substances filled in Virginia between January 2014 and January 2019, which indicated that approximately 43,052 controlled substance prescriptions were issued or authorized by JONES and filled in Virginia totaling approximately 3,647,726 pills/dosage units. Among the prescriptions, approximately 55.26% (or 23,792) were issued for Schedule II controlled substances, 0.38% (or 163) were issued for Schedule III controlled substances, 40.73% (or 17,534) were issued for Schedule IV controlled substances, 0.62% (or 265) were issued for Schedule V controlled substance.

38. Of the 3,647,726 pills/units, Schedule II controlled substances account for 63% of the pills/units and 55% of the prescriptions. Opioids and Benzodiazepines account for 95% of the pills/units and 93% of the prescriptions. Nine hundred and fourteen (914) of JONES' patients (88% of total) received at least one opioid.  There were 544 patients (52% of total) received Opioids and Benzodiazepines in the same month on 12,757 occasions.

39. Of JONES' approximately 1,040 patients, 116 (11%) had at least one occasion/fill date with an Morphine Milligram Equivalent (MME) of 180 or greater, double the Center for Disease

Control and Prevention (CDC) recommended ceiling dose. Eleven patients had MME's over

180 on 38-61 dates.

40. Schedule II Opioids consist of but not limited to hydrocodone, oxycodone, oxymorphone,

morphine, and fentanyl. Schedule IV Benzodiazepine consist of but not limited to

alprazolam, carisoprodol, clonazepam, tramadol, and zolpidem.

### Employees of CFC Receiving Controlled Substances from JONES

41. Investigators obtained raw prescription data for controlled substances filled in Virginia

between January 2014 to January 2019 by employees of JONES, which indicated that

approximately 449 controlled substance prescriptions were issued or authorized by JONES

and filled in Virginia totaling approximately 44,850 dosage units to three (3) of the five (5)

suspected employees of CFC:

    a.  Employee 1 received 247 prescriptions accounting for 21,910 dosage units, 138
being opioid prescriptions accounting for 13,849 dosage units, and 54 times a
combination of an opioid and benzodiazepine was prescribed.

    b.  Employee 2 received 74 prescriptions accounting for 7,140 dosage units, 42
being opioid prescriptions accounting for 6,180 dosage units.

    c.  Employee 3 received 128 prescriptions accounting for 15,800 dosage units, 67
being opioid prescriptions accounting for 9,440 dosage units, and 56 times a
combination of an opioid and benzodiazepine was prescribed.

42. In August 2016, the U. S. Food and Drug Administration (FDA), sent out a safety

announcement about serious risks and death when combining opioid pain or cough medicine

with benzodiazepines. According to a FDA review, the growing combined use of opioid

medicines with benzodiazepines or other drugs that depress the central nervous system

(CNS) has resulted in serious side effects, including slowed or difficulty breathing and

deaths. FDA issued a "Boxed Warning" in an effort to decrease the use of opioids and

benzodiazepines, or other opioids and CNS depressants, together.

43. Based on training and experience, your Affiant knows that opioids and benzodiazepines are desirable drugs of choice for illegitimate recreational use and are a commodity in the illicit market.

### Interviews Regarding Office Practices at CFC

44. On August 31, 2017, your Affiant and TFO Clements spoke with a Source of Information (SOI1) regarding CFC and the prescribing practices of JONES. SOI1 stated that he/she spent approximately five (5) weeks working at CFC as an intern between June and July of 2017. SOI1 recalled that some patients never saw JONES at all. SOI1 remembered patients asking if they were going to see JONES as the patients were handed their prescriptions at the end of the appointment. SOI1 further stated that he/she observed a lot of cash at CFC and that every patient paid $70.00 in cash whether they had insurance or not. SOI1 recollected several instances where patients complained that they were charged multiple times for the same visit.

45. SOI1 recalled several occasions where JONES provided a prescription to patients when SOI1 believed the patient should not have been given one. The SOI1 stated on one occasion a patient appeared to be intoxicated to the point that they were unable to stand up and needed assistance to their seat in the waiting room. The patient left CFC with a prescription for pain medication written by JONES.[3] SOI1 provided another example of a patient who was given a drug screen, which subsequently was positive for cocaine. SOI1 stated that he/she observed JONES give directions to throw the test out and JONES then proceeded to give the patient a prescription for pain medication. SOI1 stated that JONES often skipped scheduled drug screening of patients.

---

[3] SOI1 and others also noted that JONES did not give prescriptions to every single patient; some patients left JONES' clinic without prescriptions.

46. SOI1 stated that JONES was worried about a particular patient (J.S.) who died approximately four days after his last visit. According to SOI1, JONES opted not to give (J.S.) a drug screen on his last appointment before his death.

47. Even though JONES sometimes failed to give drug screens, SOI1 stated that JONES would have every patient that smoked go through a spirometry test because JONES made more from Medicaid when JONES could bill for the test.

## PROCEEDS OF JONES' CRIMES

48. A review of the financial records obtained from Branch Banking & Trust Company (BB&T) for the time period of January 2014 to May 2019 revealed that JONES is the owner/signatory for at least four accounts as listed below, each of which is believed to contain proceeds derived from and used in furtherance of illegal activity:

   BB&T Business Value 500 Checking Account 00051324757511 in the name of Community Family Care (CFC)

   BB&T Bright Banking Account 1470000014729 in the name of Vincent K. Jones

   BB&T Personal Money Rate Savings Account 0000151907903 in the name of Vincent K. Jones

   BB&T Personal Regular Savings Account 0005530571493 in the name of Vincent K. Jones.

### BB&T BUSINESS VALUE 500 CHECKING ACCOUNT 0005132475751

49. As described above, JONES maintained the premises of CFC for the purpose of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1). JONES utilized BB&T Business Value 500 Checking Account 00051324757511 to maintain his medical practice CFC,

14

located at1856 Virginia Ave, Martinsville, VA.  JONES is a signatory for this account, as well as, Rhonda C. Enalls[4].

50. Based on a review by your Affiant of the banking records received from BB&T related to JONES and CFC, they show that JONES received numerous insurance reimbursements every month directly into CFC BB&T Business Value 500 Checking Account 0005132475751. These deposits are from patient's insurance companies he (JONES) billed from his medical practice which he (JONES) operated outside the usual course of professional medical practice issuing prescriptions without a legitimate medical purpose and maintained for the purpose of distributing controlled substances.  Additionally, several times a month large cash deposits were made into the Business Value 500 Checking Account 0005132475751 which are believed to be from the cash paying clients that visit JONES clinic.  The payments from the insurance companies and the cash deposits are derived partially from the individuals that come to JONES seeking prescriptions for controlled prescription narcotics.

51. JONES utilizes the CFC BB&T Business Value 500 Checking Account to pay the rent, the insurance, the ADT security system, the utilities, and the internet bills for CFC.  JONES also utilizes this account to pay all the payroll for his employees.  JONES utilizes this account to pay his Virginia State income taxes, his federal income taxes and his medical license fees. This account, and the money in it, is used to maintain JONES medical practice and its premises.  JONES maintains the premises for the purpose of distributing controlled substances in violation of 21 U.S.C. § 856(a)(1). Therefore, this bank account facilitates JONES commission of maintaining the premises for illegal distribution and is subject to forfeiture.

---

[4] Enalls is a licensed nurse and is believed to have been a former employee of CFC.

## BB&T BRIGHT BANKING ACCOUNT 1470000014729 (JONES' PERSONAL

## CHECKING ACCOUNT)

52. Based on a review of JONES' banking records by your Affiant, it appears JONES utilized the

CFC BB&T Business Value 500 Checking Account 0005132475751 containing the proceeds

of his (JONES') crimes to pay himself a monthly salary.  JONES electronically transfers

funds (EFT) multiply times a month from CFC BB&T Business Value 500 Checking

Account 0005132475751 into his (JONES') BB&T Bright Banking Account 1470000014729

which appears to be his personal checking account:

- On April 30, 2019, $4,000.00 was transferred from CFC BB&T Business Value 500
  Checking Account 0005132475751 into BB&T Bright Banking Account 1470000014729
  (JONES' personal checking account).

- On May 2, 2019, $3,000.00 was transferred from CFC BB&T Business Value 500
  Checking Account 0005132475751 into BB&T Bright Banking Account 1470000014729
  (JONES' personal checking account)

- On May 8, 2019, $7,000.00 was transferred from CFC BB&T Business Value 500
  Checking Account 0005132475751 into BB&T Bright Banking Account 1470000014729
  (JONES' personal checking account)

- On May 21, 2019, $2,000.00 was transferred from CFC BB&T Business Value 500
  Checking Account 0005132475751 into BB&T Bright Banking Account 1470000014729
  (JONES' personal checking account).

- On May 29, 2019, $3,000.00 was transferred from CFC BB&T Business Value 500
  Checking Account 0005132475751 into BB&T Bright Banking Account 1470000014729
  (JONES' personal checking account)

53. There are no direct deposits going into the personal checking account.  It appears that the

only monies going into the BB&T Bright Banking account 1470000014729 are the EFT from

the CFC BB&T Business Value 500 checking account 0005132475751.

54. The amounts that JONES paid himself as a salary are illegal proceeds from CFC's business

checking account. Therefore, the amounts in JONES's personal checking account are also

proceeds subject to forfeiture.

## BB&T PERSONAL MONEY RATE SAVINGS ACCOUNT 0000151907903

55. Based on a review of JONES' banking records by your Affiant, it appears JONES has

    utilized CFC BB&T Business Value 500 Checking Account 0005132475751 to fund his

    BB&T Personal Money Rate Savings account 0000151907903.

    - On September 10, 2018, there was a transfer of $10,000.00 from CFC BB&T Business
      Value 500 Checking Account 0005132475751 into BB&T Personal Money Rate Savings
      Account 0000151907903

    - On August 29, 2018, there was a transfer of $6,000.00 from CFC BB&T Business Value
      500 Checking Account into 0005132475751 into BB&T Personal Money Rate Savings
      Account 0000151907903

    - On April 13, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value
      500 Checking Account 0005132475751 into BB&T Personal Money Rate Savings
      Account 0000151907903

    - On December 14, 2017, there was a transfer of $5,000.00 from CFC BB&T Business
      Value 500 Checking Account 0005132475751 into BB&T Personal Money Rate Savings
      Account 0000151907903

56. Based on the transactions, your Affiant believes JONES repeatedly funds his (JONES')

    BB&T Personal Money Rate Savings Account 0000151907903 from the CFC BB&T

    Business Value 500 Checking Account 0005132475751.

57. The amounts that JONES deposited in his money rate savings account from the CFC business

    checking account are proceeds of JONES's crimes. Therefore, the money in JONES's money

    rate savings account are also proceeds subject to forfeiture.

### BB&T PERSONAL REGULAR SAVINGS ACCOUNT 0005530571493

58. Based on a review of JONES' banking records by your Affiant, it appears JONES has

    utilized CFC BB&T Business Value 500 checking account 0005132475751 to fund his

    BB&T Personal Regular Savings account 0005530571493.

    - On September 10, 2018, there was a transfer of $10,000.00 from CFC BB&T Business
      Value 500 Checking Account 0005132475751 into BB&T Personal Regular Savings
      Account 0005530571493

- On April 13, 2018, there was a transfer of $10,000.00 from CFC BB&T Business Value 500 Checking Account into 0005132475751 into BB&T Personal Regular Savings Account 0005530571493

- On March 5, 2018, there was a transfer of $900.00 from CFC BB&T Business Value 500 Checking Account into 0005132475751 into BB&T Personal Regular Savings Account 0005530571493

- On March 6, 2018, there was a transfer of $900.00 from CFC BB&T Business Value 500 Checking Account into 0005132475751 into BB&T Personal Regular Savings Account 0005530571493

- On January 3, 2018, there was a transfer of $8,000.00 from CFC BB&T Business Value 500 Checking Account into 0005132475751 into BB&T Personal Regular Savings Account 0005530571493

- On December 12, 2017 there was a transfer of $5,000.00 from CFC BB&T Business Value 500 Checking Account into 0005132475751 into BB&T Personal Regular Savings Account 0005530571493

59. Based on the transactions, your Affiant believes JONES repeatedly funded his (JONES') BB&T Personal Money Rate Savings account 0000151907903 from the CFC BB&T Business Value 500 Checking Account 0005132475751.

60. The amounts that JONES deposited in his personal money rate savings account from the CFC business checking account are proceeds of JONES's crimes. Therefore, the money in JONES's money rate savings account are also proceeds subject to forfeiture.

61. Base on the foregoing information, you Affiant believes that probable cause exits to forfeit the $45,839.80 in U.S. Currency seized from the above listed accounts under 21 USC § 881(a)(6) and 18 USC §891.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __3rd__ day of February 2020

Anita Sowers

Task Force Officer

Drug Enforcement Administration

19

JS 44 (Rev. 12/12)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
United States of America

## DEFENDANTS
Cashier's check #1002137744 from BB&T in the amount of $7,025.29, et al.

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Krista Consiglio Frith, Assistant United States Attorney
310 First Street, S.W., Room 906
Roanoke, VA 24011, (540)857-2250

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1  U.S. Government
       Plaintiff

☐ 2  U.S. Government
       Defendant

☐ 3  Federal Question
       *(U.S. Government Not a Party)*

☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☒ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 400 State Reapportionment |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | | | ☐ 410 Antitrust |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | **PROPERTY RIGHTS** | ☐ 430 Banks and Banking |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 820 Copyrights | ☐ 450 Commerce |
| ☐ 151 Medicare Act | ☐ 340 Marine | | ☐ 830 Patent | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | **PERSONAL INJURY** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | ☐ 365 Personal Injury - Product Liability | ☐ 791 Employee Retirement Income Security Act | | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 368 Asbestos Personal Injury Product Liability | | **FEDERAL TAX SUITS** | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | **PERSONAL PROPERTY** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 370 Other Fraud | | ☐ 871 IRS—Third Party 26 USC 7609 | |
| ☐ 245 Tort Product Liability | ☐ 371 Truth in Lending | | | |
| ☐ 290 All Other Real Property | ☐ 380 Other Personal Property Damage | | | |
| | ☐ 385 Property Damage Product Liability | | | |

| CIVIL RIGHTS | PRISONER PETITIONS |
|---|---|
| ☐ 440 Other Civil Rights | **Habeas Corpus:** |
| ☐ 441 Voting | ☐ 463 Alien Detainee |
| ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |
| ☐ 443 Housing/ Accommodations | ☐ 530 General |
| ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty |
| ☐ 446 Amer. w/Disabilities - Other | **Other:** |
| ☐ 448 Education | ☐ 540 Mandamus & Other |
| | ☐ 550 Civil Rights |
| | ☐ 555 Prison Condition |
| | ☐ 560 Civil Detainee - Conditions of Confinement |

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
       Proceeding

☐ 2  Removed from
       State Court

☐ 3  Remanded from
       Appellate Court

☐ 4  Reinstated or
       Reopened

☐ 5  Transferred from
       Another District
       *(specify)*

☐ 6  Multidistrict
       Litigation

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
21 USC 881
Brief description of cause:
Civil Forfeiture

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*
JUDGE Kiser           DOCKET NUMBER 4:19CR00035

DATE
02/04/2020

SIGNATURE OF ATTORNEY OF RECORD
s/Krista Consiglio Frith

**FOR OFFICE USE ONLY**

RECEIPT #           AMOUNT           APPLYING IFP           JUDGE           MAG. JUDGE